UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                        Plaintiff,

                                                              **DECISION AND ORDER**
                v.                                            19-CR-36-A

TODD LARABA,

                                        Defendant.

_____

On December 12, 2023, after three days of proof in this home-invasion-style robbery case, a jury convicted Defendant Todd Laraba on one count of Hobbs Acts Conspiracy, in violation of 18 U.S.C. § 1951(a); and one count of Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a) and § 2.  *See* Dkt. Nos. 258 (Jury Verdict), 261 (Redacted Indictment).  After the Government rested, Defendant moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, which the Court denied from the bench.

Pending before the Court are Defendant's post-trial motions (Dkt. No. 264), filed on March 26, 2024,[1] renewing his motion for a judgment of acquittal notwithstanding the jury's verdict pursuant to Rule 29(c) or, alternatively, moving for a new trial pursuant to Federal Rule of Criminal Procedure 33.  The Government

---

[1] Rule 29 provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."  Fed. R. Crim. P. 29(c)(1).  On March 17, 2024, 82 days after the 14-day deadline, defense counsel filed a motion (Dkt. No. 262) asking for permission to file Defendant's Rule 29 motion by March 29, 2024.  In the Court's discretion, it granted that motion due to excusable neglect.  Dkt. No. 263 (Text Order).

filed a response (Dkt. No. 268) in opposition on April 30, 2024.  Defendant's reply deadline was May 14, 2024, but no reply papers were filed.  Oral argument was held on June 10, 2024, at which time the Court reserved decision.  For the reasons stated below, the motions are DENIED.  Defendant's motion (Dkt. No. 279) for release pending a decision on his post-trial motions is terminated as MOOT.

## BACKGROUND

Familiarity with the facts of the case and the evidence presented at trial is presumed.  The following is a summary of the evidence,[2] viewed "in the light most favorable to the government, with all reasonable inferences drawn in its favor." *United States v. Rowland*, 826 F.3d 100, 105 n.1 (2d Cir. 2016) (quotations omitted).

Christopher Rathman decided to store proceeds from his pool-installation business, C. Rathman, Inc. d/b/a The Pool Guy, at the home of his elderly parents, Phyllis Rathman and Roger Rathman ("the Rathmans"),[3] in Tonawanda, New York. Christopher's wife had begun to spend the cash revenue he had in the bank from his business on online gambling, so Christopher elected to keep the cash elsewhere. Christopher asked Defendant, his good friend who he had known since high school, to assist him in storing the money.

In June 2017, with Phyllis present, Defendant and Christopher counted out the $170,000 in cash at the Rathmans' kitchen table.  They divided that money into

---

[2] The Court's summary herein is based upon the trial transcripts that have been filed, Dkt. Nos. 250-254, as well as its independent recollection of the proof at trial.

[3] Phyllis was a main fact witness at the trial, and testified that because Roger had dementia, moved "very slowly," and had trouble speaking, he was unable to testify.

two piles, placing $60,000 in one lock box and $110,000 in another lock box. Christopher already had one of the lock boxes, and Defendant had purchased the other lock box at Home Depot at Christopher's directive.  With Defendant only 10-to-12 feet away from the attic steps, in the kitchen, Christopher went up to the attic and hid the lock boxes, tucking them under insulation, boxes, and a framed picture.  The area where Christopher secreted the lock boxes was directly above the dining room table, which was no more than 13 feet from the kitchen table.  Christopher had an unexplained, "bad feeling" while hiding the lock boxes, so he purposefully took one box and placed it on the opposite side of the attic from the other box.

Twice that summer after the $170,000 had been stashed away, Defendant asked Christopher if the money was still stored in the Rathmans' attic.  Those queries did not raise any red flags for Christopher at the time because he thought Defendant was simply concerned about his well-being.  He continued to see Defendant socially every day, and Defendant worked for him off-and-on. Christopher also let Defendant borrow money from him; Defendant always commented he did not have money.

The evening of September 28, 2017, Christopher received a phone call from Defendant, and they spoke about going to lunch the next day and Defendant helping Christopher close a pool.  Defendant asked Christopher what he was up to, and Christopher said he was at his home in Lockport, New York, and was going to stay in for the night to watch football and have a few drinks—thereby confirming he was not at the Rathmans'.

That same night, the Rathmans, who were in their 70's in 2017 and in their 80's during the trial, were at home.  They ate dinner, and then proceeded to the family room to watch television, their backs facing the rear entrance to the house.  The back door itself was open but the screen door was locked.  At approximately 8:30 p.m., Phyllis heard a noise behind her and the door open.  Two men entered the house wearing all-black outfits, gloves, and white Halloween masks such as those from the movie *Scream*.  One man said, "You are not going to get hurt.  This is going to be over real [sic] quick."  The men then zip-tied the Rathmans' ankles and wrists together and taped up their eyes and mouths with duct tape.  The shorter, stockier man bound Phyllis, and the taller man with a medium build bound Roger.

The taller man then walked across the room and made his way into the attic by way of the kitchen.  The shorter man did not leave Phyllis's side.[4]  Phyllis testified that she heard a rustling, followed by a loud sound that ended up being the dining room ceiling "coming down."  Phyllis explained that there is no floor in the attic so "if you miss a joist, you go through the ceiling[.]"  The taller man then exited the attic, and the men left the Rathmans'.  With the intruders gone, Phyllis was able to extricate herself from her bindings, and she cut the zip ties off her husband.  Phyllis and Roger saw the kitchen phone was removed from the wall, the attic stairs pulled down, and there was damage to the dining room ceiling.

---

[4] Phyllis recalled she was able to see the shoes of the shorter man by looking downwards out of the bottom of the duct tape, which was loosely stuck to her face, and that he did not move when the taller man proceeded to the attic.

Phyllis called Christopher and told him she and Roger had been robbed.  At around 9:00 p.m. or ten minutes after the robbers had left, she called 911 as Christopher instructed.  The police responded to the scene and patrolled the area to search for the intruders but did not locate them.  When Christopher arrived at the house, he discovered that the lockbox with $60,000 was missing, which was revenue from his 2017 pool season.  He testified that he would be using that money to purchase "everything" at the beginning of the 2018 season, including supplies for The Pool Guy.  The second lockbox, containing $110,000, remained undisturbed at the far end of the attic and away from the stairway entrance.

Christopher tried to call Defendant after he heard about the robbery but was unable to get through to him.  The next day, Defendant still did not answer Christopher's phone calls even though they had plans, but that evening, Defendant arrived at Christopher's house, acting strange.  He threw up his arms and said, "Oh great, now the cops are involved!" in relation to the robbery.  Before the robbery, Chistopher saw Defendant every day, but after the robbery he saw Defendant only a few times and their interactions were awkward.  On November 30, 2023, five days before jury selection, Christopher saw Defendant at a local corner store and Defendant blocked in his truck, stating, "Why can't you just let this go?"

Captain Jesse Haug from the Town of Tonawanda Police Department responded to the scene on September 28, 2017.  He had previously responded to hundreds of burglaries and testified that this one appeared to be very specific, in that the perpetrators knew what they were doing and what they were looking for.  Aside from the holes in the dining room ceiling, the home was neat and orderly, and

nothing was rummaged around in or disheveled.  Detective Thomas Moore, who photographed the scene, noted that if the burglary had been random, the boxes in the attic would have been sifted through but they appeared untouched.

The Government's DNA expert, Denise Bantle, testified that DNA analysis later established the major DNA profile on the zip ties and duct tape recovered from the crime scene matched Defendant's DNA profile.

After the Government rested, Defendant put on an alibi defense.  His wife testified that during the timeframe of the robbery, to her knowledge Defendant attended a Narcotics Anonymous ("NA") meeting in Lockport, New York, and stopped on the way home to pick up milk at a gas station/convenience store at her request.  He left their house at 6:50 p.m., the meeting would have started at 7:00 p.m. and ended at 8:30 p.m., and while Defendant generally would have arrived home from his meeting at 8:40 or 8:45 p.m., he instead got home between 8:50 and 9:00 p.m., which was consistent with him making a quick stop for milk.

The Government then called a rebuttal witness, Detective Jeffrey Campanella, who testified that three days after the robbery, he called Defendant, who he had developed as a suspect.  Det. Campanella asserted Defendant knew about the hidden money.  In response, Defendant told Det. Campanella he had communicated with Christopher at 7:30 p.m. the evening of the robbery and Defendant was at home with his wife and children, lying in bed watching a movie, between 7:30 p.m. and 9:00 p.m.—in direct conflict with the alibi his wife provided. Defendant never mentioned to Det. Campanella that he had been at an NA meeting.

After they deliberated for about one hour, the jury returned a verdict of guilty on both counts.

## DISCUSSION

### I.     Defendant's Rule 29 Motion

"Rule 29[, or a motion for a judgment of acquittal,] permits a trial court to set aside a jury's guilty verdict if it determines the evidence was 'insufficient to sustain a conviction.'"  *United States v. Greene*, No. 20-1560, 858 F. App'x 16, 17 (2d Cir. 2021) (summary order), quoting Fed. R. Crim. P. 29(a).  A defendant claiming that he was convicted based on insufficient evidence "bears a heavy burden."  *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (quotation omitted).  "When reviewing a challenge to the sufficiency of the evidence, [the district court] must view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in its favor." *United States v. Kwong*, 14 F.3d 189, 193 (2d Cir. 1994).  A Rule 29 motion is granted only when evidence that the defendant committed the crime alleged "is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (quotations omitted).

Defendant moves for a judgment of acquittal notwithstanding the jury's verdict on three grounds, arguing that the Government failed to present legally sufficient evidence to establish: (a) his identity as one of the two robbers; (b) the existence of a conspiracy as to Count 1; or (c) the jurisdictional element of either Counts 1 or 2. Each argument is addressed below, and Defendant's Rule 29 motion is denied.

**_Identification of Defendant_**

Defendant argues that the Government failed to identify him, beyond a reasonable doubt, as one of the two robbers.

He first fixates on the fact that no eyewitness identified him. "Of course, there is no rule of law that requires identity to be established by an eyewitness. Identity can be inferred through circumstantial evidence." *Kwong*, 14 F.3d at 193; *see Glenn*, 312 F.3d at 64 ("[T]he absence of any direct evidence . . . is not dispositive; the prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt."). As is expanded upon below, there is a considerable volume of circumstantial evidence that Defendant committed the September 28, 2017, robbery.

Defendant also suggests that contradictions between the testimony of Christopher and Phyllis regarding how familiar Phyllis was with Defendant, among other differences, rendered their testimony incredible as a matter of law. Defendant reasons that if he was present in the Rathmans' residence on the date in question, then Phyllis should have been able to identify him by his physique and/or voice.

The disparities Defendant dwells on are relatively minor, particularly considering the six-year gap between the robbery and the witnesses' testimony. Moreover, Defendant does not account for the fact that Christopher's and Phyllis's testimony did align in many respects and their testimony was corroborated by other evidence at trial. *See United States v. Josephberg*, 562 F.3d 478, 494-95 (2d Cir. 2009) ("It is the task of the jury … [to] determine whether an inconsistency in a witness's testimony represents intentionally false testimony or instead has innocent

8

provenance such as confusion, mistake, or faulty memory."); *United States v. Tucker*, S5 05 Cr. 711 (SAS), 2008 WL 3538714, 2008 U.S. Dist. LEXIS 61636, *14 ("[I]t would be both surprising and suspicious if two people gave entirely consistent detailed accounts of events that occurred several years ago . . . The critical elements of each witness's testimony were corroborated by the testimony of the other witnesses and by physical evidence.").  Even if Phyllis had greater familiarity with Defendant than she let on, the jury could have still reasonably inferred that she did not identify him simply because she could not in the context of the robbery, seeing as he was wearing a disguise and did not speak.[5]

Defendant also argues that Christopher admitted to various tax crimes on the stand, *e.g.*, tax fraud and tax evasion, and therefore the jury should have discredited his testimony in its entirety.  Christopher was extensively cross-examined on this topic; thus, the jury had this information at their disposal in evaluating his credibility. In reviewing a Rule 29 motion, the Government must receive the benefit of "all inferences . . . [on] issues of credibility in favor of the [jury's] verdict."  *United States v. Howard*, 214 F.3d 361, 363 (2d Cir. 2000).

 In sum, Defendant's arguments concerning witness credibility and lack of eyewitness identification testimony are without merit.

---

[5] Phyllis testified that the robber who assured her and Roger they would not get hurt was "[p]ossibly the one that was standing by me . . . [b]ecause I heard it very clear." This was the shorter of the two robbers, who remained by her side and did not go into the attic.  Based on this testimony and testimony concerning Defendant's knowledge of where the $170,000 was stored, the jury could have easily found that Defendant did not stand aside Phyllis and did not talk at all during the robbery—which would make sense if he was concerned about Phyllis potentially identifying him.

### _Existence of a Conspiracy and Defendant's Knowing Participation_

Piggybacking off his lack-of-identification argument, Defendant argues that the Government did not prove the existence of a conspiracy beyond a reasonable doubt, because it did not prove he was at the Rathmans' on the date of the robbery.

Viewing the evidence in its totality and in the light most favorable to the prosecution, the evidence at trial easily established Defendant was one of the two robbers.  _See Kwong_, 14 F.3d at 194 ("As Thoreau has observed, 'some circumstantial evidence is very strong, as when you find a trout in the milk.'"), quoting Henry D. Thoreau, _Journal_, Nov. 11, 1850.

Defendant ensured Christopher would not be around the evening of the robbery and attempted to verify the $170,000 in cash remained in the attic.  At approximately 8:30 p.m. on September 28, 2017, Defendant and an accomplice broke into the Rathmans' home, wearing masks and all-black outfits, and bound the Rathmans' wrists and ankles and covered their eyes and mouths.  The accomplice remained with Phyllis while Defendant, who knew the precise location of at least one lock box because he had heard Christopher hiding it feet away from him in June 2017, bypassed Phyllis and went directly to the attic to recover the money.  Defendant either did not know where the second lock box was hidden because Christopher did not tell him he separated the two boxes, or Defendant previously gathered where it was by Christopher's footsteps but fled the scene before he could retrieve it when he almost fell through the rafters.  After the robbery, Defendant avoided Christopher, and attempted to influence or intimidate him less than a week

before the trial.  Defendant was not at an NA meeting during the robbery, despite his wife providing an alibi for him.

With respect to the elements the Government was required to prove on the conspiracy count, "[i]n Hobbs Act robbery conspiracy cases, it is the government's burden …to establish two elements against [the] defendant: (1) the existence of a conspiracy to rob ('first element'), and (2) knowing participation in that conspiracy ('second element')."  *United States v. Santos*, 449 F.3d 93, 96-97 (2d Cir. 2005); *see United States v. Gunn*, 419 F. App'x 106, 108 (2d Cir. 2011) (summary order) ("In Hobbs Act robbery conspiracy cases, [t]he elements that the Government must establish are [1] the existence of a conspiracy to commit a robbery that would have affected, or did affect, interstate commerce, and [2] the defendant's knowing participation in that conspiracy.").[6]  Defendant asserts that the Government failed to prove these two elements, *i.e.*, that two or more people entered into an unlawful agreement and that Defendant knowingly, willfully, and voluntarily became a member of the conspiracy.

"[D]eference [to the trier-of-fact] is especially important when reviewing a conviction of conspiracy…This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel."  *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992) (quotations and citations omitted).  The "agreement [to participate in the conspiracy] may be inferred from the facts and

---

[6] In Hobbs Act prosecutions, no overt act in furtherance of the conspiracy need be proven.  *See United States v. Clemente*, 22 F.3d 477, 480 (2d Cir. 1994).

circumstances of the case[,]" and "[b]oth the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence." *United States v. Wexler*, 522 F.3d 194, 207-08 (2d Cir. 2008) (quotations and citations omitted).

There was ample circumstantial evidence for the jury reasonably to conclude that Defendant knowingly and intentionally joined a conspiracy to rob the Rathmans. Again, Defendant's knowledge of where the money was hidden and the layout of the Rathmans' home, his probing questions to Christopher concerning Christopher's whereabouts and whether the money remained at the Rathmans', Defendant's behavior towards Christopher after the robbery, and the evidence that Defendant's DNA was on zip ties and duct tape from the crime scene, in totality establish beyond a reasonable doubt that Defendant entered into a conspiracy with his accomplice.

As to Defendant's complaint that the Government did not identify other members of the Hobbs Act conspiracy, the law of the Second Circuit is clear that the Government must prove and the jury must find that the two or more persons, including Defendant, conspired to accomplish an unlawful purpose with awareness of its unlawful nature. *See United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010); *see also United States v. Anderson*, 747 F.3d 51, (2d Cir. 2014) ("To sustain a conspiracy conviction, the government must present some evidence from which it can be reasonably inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.") (quotations and citations omitted). "[T]he Government [does] not have to prove the identities [of co-conspirators] in order to secure a [conspiracy]

12

conviction[.]"  *United States v. Dove*, 884 F.3d 138, 147 (2d Cir. 2018); *see also United States v. Downing*, 297 F.3d 52, 57 (2d Cir. 2002) (requiring for a crime of conspiracy under a different statute proof "that the defendant agreed with at least one other person to commit an offense").  "[A] defendant may be a co-conspirator if he knows only one other member of the conspiracy[.]"  *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (citation omitted).

Here, the Government presented sufficient evidence for the jury to conclude that Defendant, as one of the robbers, knew the person with whom he entered the house and wore the same disguise, and that the two agreed to commit the unlawful objective of stealing the money in the attic.  That the Government did not prove the identity of that other robber—and Defendant's co-conspirator—does not, under the circumstances of this case, in any way diminish the sufficiency of the evidence.

Defendant finally reasons because it is "possible" one or both robbers could have been extorted into participating in the robbery, there is inadequate proof of a conspiracy or of his criminal intent.  Defendant's speculation overlooks the well-known principle, however, that the Court "looks at the evidence in its totality, and the Government need not negate every theory of innocence."  *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002) (quotations and citation omitted).

### *Interstate Commerce*

Defendant last argues that the Government failed to establish beyond a reasonable doubt the jurisdictional element of either count of conviction, *i.e.*, that the robbery and conspiracy to commit the robbery impacted interstate commerce.

"The Hobbs Act proscribes, *inter alia*, robberies, attempted robberies, and conspiracies to commit robberies that 'in any way or degree obstruct[ ], delay[ ], or affect[ ]' interstate commerce."  *United States v. Wilkerson*, 361 F.3d 717, 726 (2d Cir. 2004) (italics added), *cert. denied*, 543 U.S. 908 (2004), quoting 18 U.S.C. § 1951(a), (b)(3); *see United States v. Gomez*, 580 F.3d 94, 100 (2d Cir. 2009) ("To sustain a Hobbs Act conviction, there must be evidence that the underlying act affected interstate commerce.").  "[I]t is well established that the burden of proving a nexus to interstate commerce is minimal."  *United States v. Elias*, 285 F.3d 183, 188 (2d Cir. 2002).  Indeed, even a "very slight effect" or a "potential or subtle effect" on interstate commerce is enough to satisfy the jurisdictional requirement.  *United States v. Angelilli*, 660 F.2d 23, 35 (2d Cir. 1981) (citations omitted).

The Second Circuit in *United States v. Perrotta*, 313 F.3d 33 (2d Cir. 2002), explained that where an individual is robbed, rather than a business:

> There are instances where a robbery…of an employee of a business engaged in interstate commerce would likely support Hobbs Act jurisdiction.  The jurisdictional nexus could be satisfied by showing [1] that the victim directly participated in interstate commerce; [2] that the victim was targeted because of [his or] her status as an employee at a company participating in interstate commerce; [3] that *the harm or potential harm to the individual would deplete the assets of a company engaged in interstate commerce*; [4] that *the crime targeted the assets of a business rather than an individual*; or [5] that the individual was extorted of a sum so large, or targeted in connection with so many individuals, that the amount at stake cumulatively had some effect on interstate commerce.

*Id.* at 37-38 (citations omitted and emphases added) (collecting cases).

14

The Government argues its proof was sufficient to establish that Defendant "targeted and depleted the assets of a business engaged in interstate commerce," that is, the third and fourth effect-on-commerce theories set forth in *Perrotta*.  As to the third theory, "[d]epletion of the assets of a business engaged in interstate commerce is a common method for demonstrating that a robbery had an effect on interstate commerce . . . This is so even if the business's assets were stolen from a home."  *United States v. Jiminez-Torres*, 435 F.3d 3, 9 (1st Cir. 2006).

Second Circuit case law has parsed out some contours of these theories.  In *Wilkerson*, the defendant argued on appeal that the evidence was legally insufficient to support the jury's finding that the attempted Hobbs Act robbery/conspiracy, if successful, would have affected interstate commerce.  *Wilkerson*, 361 F.3d at 721. The victims owned (and occupied part of) the multi-dwelling residential building where they were robbed, and they used the building's basement exclusively to store materials used in their local landscaping business, as well as personal items.  *Id.* The business was "informal" meaning it, among other things, was not incorporated and had no separate bank account or written records.  *Id.* at 729-30.

While the landscaping business serviced only residential, in-state customers, there was proof at trial that most of the supplies stored in the basement had originated from outside New York.  *Wilkerson*, 361 F.3d at 730.  Moreover, the victim who survived testified about the cash the second victim was carrying when he was killed—the victims were intending to use that money to buy gardening equipment for the business and to pay for other, family-related expenses, although there was no evidence in the record to indicate the source of that money (such as yielded from the

business, rental income from the building, or the victims' salary from their part-time job).  *Id.*  There was also testimony from defendant's fellow prisoner that defendant had shared several reasons for robbing the victims, including that he knew the victims owned a landscaping business and that they always kept large sums of money inside their house.  *Id.*

The Circuit held the foregoing evidence "establish[ed] a sufficient nexus between the charged offenses and interstate commerce to satisfy the interstate commerce element of the Hobbs Act, albeit barely."  *Wilkerson*, 361 F.3d at 730-31. The Circuit noted, "the fact that a robbery takes place at a residence does not transform the robbery from the robbery of a business into the random robbery of an individual (as was the case in *Perrota*), so long as the evidence supports the conclusion that the robbery targeted the assets of a business."  *Id.* at 731.

Here, the proof at trial established a greater interstate nexus than Christopher's mere employment with a company doing business in interstate commerce, which would be indisputably insufficient to establish the jurisdictional element.  *See Perrotta*, 313 F.3d at 38 ("Merely showing employment with a company that does business in interstate commerce, without more, stretches the Hobbs Act too far.").  Rather, the circumstances are more akin to those in the *Wilkerson* line of Circuit case law.[7]

---

[7] *See e.g. United States v. Silverio,* 335 F.3d 183, 187 (2d Cir. 2003) (the proof was sufficient to demonstrate an interstate nexus because the victim (a doctor) who was robbed at his home "was a direct participant in interstate commerce through his business of treating a worldwide celebrity clientele, because the robbery would have depleted the assets of [the victim]'s business, and because the robbery targeted the assets of his business rather than his personal property"); *Vasquez v. United States*,

Christopher testified that the money he stored in the Rathmans' attic was cash generated from his seasonal business—which installed and serviced pools—and was money he would have used, in part, to cover his start-up costs for the following 2018 pool season.[8]  Specifically, he testified as follows:

> Q.  The [ ] box that was stolen, the money that was in it, was that all revenue from The Pool Guy?
>
> A.  That was from the 2017 season.
>
> Q.  If that money had not been stolen, what were you going to use that money for?

---

2019 U.S. Dist. LEXIS 203614, *4-5 (S.D.N.Y. Nov. 21, 2019) (denying the defendant's 28 U.S.C. § 2255 motion and holding that the jurisdictional requirements had been satisfied with respect to the home robbery, where "the victim himself participated directly in interstate commerce, since his work as a livery cab driver primarily consisted of 'transporting clients between New York and New Jersey'", "the victim was effectively running the livery cab business out of the home that [the defendant] robbed", and the "$17,000 in cash that [the defendant] robbed from the victim's safe were proceeds from the victim's cab business"); *United States v. McIntosh*, 2014 U.S. Dist. LEXIS 6413, *14-15 (S.D.N.Y. Jan. 17, 2014) (denying the defendant's Rule 29 motion with respect to certain Hobbs Act robbery counts, where the defendant had found approximately $60,000 in cash hidden in the ceiling of the victim's garage, and where the victim testified that the stolen money was "'from all [his] work from over the years,' and that he was engaged in two business enterprises"—it was "sufficient" that the Häagen-Dazs ice cream the victim purchased from in-state suppliers through his own, self-employed business (he bought ice cream wholesale from a distributer and sold it to mom-and-pop grocery stores) originated out-of-state); *United States v. Acosta*, 595 F. Supp. 2d 282, 297-298 (S.D.N.Y. 2009) (rejecting a defendant's argument, on his motion for judgment of acquittal, that the Hobbs Act robberies and conspiracy charged did not have a *de minimis* effect on interstate commerce, reasoning that "[e]ven though [the victim] was robbed in front of his house, he was robbed of the products he sold as part of his business, which depleted the assets of the stores to which he sold, and those stores were engaged in interstate commerce . . . [and] the robbers specifically and knowingly targeted [the victim]'s business proceeds, not his personal finances").

[8] Christopher was paid only by cash or check.  He preferred cash because sometimes he did not deposit it all in the bank, and sometimes materials were less expensive when using cash rather than other means of payment.

A.  Everything.  To live.  The beginning of … the season, I have to… get all my stuff ready.  And obviously, if it was a year, I'd flip machines.  If I run out of money in the wintertime if I'm not doing a lot of construction work, I got [sic] to pay my bills, so it goes in the bank.

Q.  Would that money have been used to purchase supplies for The Pool Guy?

A. Yes… Every season when I start up, I got to get Teflon tape, duct tape, sand block.  The machines got [sic] to be gone through or traded in; same with the trailer, the dump trucks.  And, at that time, I had five vans on the road.  Crew was working.  So, I had to get maintenance and stuff done on that stuff.  I mean, it's just every year, it's the same thing over and over.

Q.  So, without the money that was stolen, how were you able to do all of that?

A.  Because they only got one of the lock boxes.

Q.  So, even though they stole it, you still had enough to get started?

A.  Yeah.  Yes.

Dkt. No. 251, p. 35-36.

The Government also admitted into evidence receipts for equipment and supplies Defendant had purchased for The Pool Guy, some of which he obtained from the Internet and/or out-of-state retailers.  *See* Dkt. No. 251, pp. 3-16; Gov't Ex. 19, 20.  For example, Defendant testified there were business supplies he purchased from the Internet, including a "sod cutter," and Teflon tape and duct tape "every year."  He had also purchased a trailer in Michigan in 2017, and numerous trailers in that state because they were of higher quality and less expensive.  *See* Gov't Ex. 23.  He swapped out new trailers "[e]very few years."  Defendant also

testified that The Pool Guy does not install pools exclusively in New York State, but also in Pennsylvania.  He could not remember whether The Pool Guy had installed any pools in Pennsylvania in 2017, testifying, "I'm not sure… I know some years we do, some years we don't…Sometimes we go to Pennsylvania and install there, too."

The Court concludes that the preceding proof was legally sufficient to establish the interstate nexus required to confer jurisdiction.  A reasonable jury could find based on Christopher's testimony that the stolen money was from his business, and therefore Defendant took $60,000 of Christopher's pool-business proceeds—not just Christopher's personal funds earmarked for The Pool Guy's purchases.  In addition, because Defendant and Christopher had been close friends at the time, Christopher was privy to the nature of Defendant's business having worked for Christopher "off and on," and Defendant knew why Christopher was hiding the money at the Rathmans', the jury could infer that Defendant had targeted business proceeds falling within the scope of the Hobbs Act, planning to rob the Rathmans' because he believed The Pool Guy's proceeds were hidden there.

In sum, there was proof supporting a finding that Defendant targeted the assets of The Pool Guy, *see Wilkerson*, 361 F.3d at 731, or to make a reasonable inference that Defendant believed he was targeting business proceeds, *see Silverio*, 335 F.3d at 187 (reiterating that when circumstances make it impossible to establish an actual effect on interstate commerce, "a robber's belief about the object of the robbery is sufficient to establish the interstate nexus").  Even though Christopher's method of storing The Pool Guy's business funds may appear odd or suspicious, he explained why he was stashing his money at the Rathmans'; the jury was free to

19

either believe or disbelieve his explanation; and the Second Circuit has noted in considering a non-traditional, non-incorporated business (a landscaping business, nonetheless), "we have affirmed Hobbs Act convictions where the victims' businesses did not comply with all of the formalities observed in the legitimate business world and, indeed, even where the victims engaged in the buying and selling of contraband." *Wilkerson*, 361 F.3d at 731.

Defendant argues there could not have been an effect on interstate commerce because there was no interruption to Christopher's business after the robbery. Christopher's testimony that he was able to continue operating The Pool Guy because the robbers did not take the remaining $110,000, is without moment. "In a Hobbs Act prosecution…[a]ll that need be shown is the possibility or potential of an effect on interstate commerce, not an actual effect." *United States v. McIntosh*, Nos. 14-1908, 14-3922, 17-2623, 2023 WL 382945, 2023 U.S. App. LEXIS 2131, *7 (2d Cir. 2023) (amended summary order) (quotations and citation omitted). In addition, Defendant's commingling-of-funds argument has been rejected by the Circuit. *See Wilkerson*, 361 F.3d at 728-31 ("That some or all of the money [the victim] was carrying may have come from a source other than the landscaping business is of no moment, given that a rational juror could have inferred that [defendant] had targeted assets of the … landscaping business and that at least some of the money [the victim] was carrying at the time of the hold up would have been used to purchase out-of-state supplies for that business."), citing *United States v. Jamison*, 299 F.3d 114, 119-21 (2d Cir. 2002).

II.   **Defendant's Rule 33 Motion**

"Upon [a] defendant's motion, [a] court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  When considering a Rule 33 motion and "[i]n the exercise of its discretion, the court may weigh the evidence and credibility of witnesses."  *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000).  "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (quotations and citations omitted).  As such, a court may exercise its authority under Rule 33 only " 'sparingly and in the most extraordinary circumstances.' " *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992) (citation omitted).  "To grant [a] motion [for a new trial], '[t]here must be a real concern that an innocent person may have been convicted.' " *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (citations omitted).

There is no discernible argument in his motion papers why Defendant is entitled to a new trial.[9]  The Court declines to exercise its discretion to set aside the jury's verdict on the ground of any doubts about the credibility of the Government's witnesses, and the Court concludes Defendant was not denied a fair trial and the

---

[9] When defense counsel moved (Dkt. No. 262) for an extension of time to file post-trial motions, he referenced Rule 29, only.  Thus, the Rule 33 motion is untimely.  "Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty."  Fed. R. Crim. P. 33(b)(2).  However, a Rule 33 motion is a claim-processing rule, and as the Government has not opposed the motion on the ground of untimeliness, the Government has forfeited the issue.  *See United States v. Robinson*, 430 F.3d 537, 541-42 (2d Cir. 2005) (discussing how the Supreme Court in *Eberhart v. United States*, 546 U.S. 12 (2005) (per curiam) had "recently clarified that [time limits for motions such as Rule 33 motions] are not jurisdictional [and are instead claim-processing rules] and can be waived.").

jury's verdict was not manifestly unjust.  Defendant's motion is denied.  *See, e.g.,*
*United States v. Smothers*, 20-cr-213 (KAM), 2023 WL 6796295, 2023 U.S. Dist.
LEXIS 184650, *33 (E.D.N.Y. Oct. 13, 2023) ("Apart from his general arguments that
the evidence against him was legally insufficient and that the witnesses at trial
lacked credibility, [the defendant] does not articulate a [ ] reason why justice requires
vacating his conviction and ordering a new trial.") (quotations and citation omitted).

## CONCLUSION

For the foregoing reasons, Defendant's motions (Dkt. No. 264) pursuant to
Federal Rule of Criminal Procedure 29(c) for a judgment of acquittal notwithstanding
the jury's verdict or, alternatively, for a new trial pursuant to Federal Rule of Criminal
Procedure 33, are DENIED.  Defendant's motion (Dkt. No. 279) for release pending
the instant decision on his post-trial motions is terminated as MOOT.

On the date the jury returned its verdict, Defendant's sentencing was
scheduled for May 30, 2024, but that date was cancelled due to the pending post-
trial motions.  The sentencing is hereby rescheduled for November 7, 2024, at 12:30
p.m.  The parties are directed to the Court's forthcoming Text Order for the
submission of sentencing documents.

**IT IS SO ORDERED.**

  *s/Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT


Dated:   August 30, 2024
         Buffalo, New York

22